## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| | ) | |
| **ELIZA PARHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-cv-1613 (GMH)** |
| | ) | |
| **CIH PROPERTIES, INC., *ET AL.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This breach of contract case[1] involves allegations of property damage by Plaintiff Eliza Parham against her landlord, Defendants CIH Properties, Inc. and CIH Ventures, Inc.[2]  The damage stems from a water leak in Plaintiff's apartment which occurred in September 2011.  On April 28, 2016, this Court concluded a one-day bench trial on Plaintiff's claim for damages.  Upon considering the evidence and testimony presented at the trial, and the entire record herein,[3] the Court finds that Plaintiff has proven Defendants' liability for breach of contract but has not met her burden to prove actual damages.  Therefore, judgment will be entered for Plaintiff, but she will be awarded only nominal damages in the amount of $1.00.

---

[1] Plaintiff's original complaint sought recovery against the Defendants based on discrimination, fraudulent misrepresentation, and breach of contract theories.  Compl. [Dkt. 1-1]; Am. Compl [Dkt. 11].  On September 8, 2015, this Court granted Defendants summary judgment on Plaintiff's discrimination and fraudulent misrepresentation claims, finding that the record did not contain sufficient evidence for Plaintiff to prevail on either of them.  Mem. Op., Sept. 8, 2015 [Dkt. 32].  Thus, only Plaintiff's breach of contract claim remains.

[2] On January 14, 2016, with the consent of the parties, this case was referred to the undersigned for all purposes.

[3] The relevant docket entries for purposes of the Court's Findings of Fact and Conclusions of Law are:  (1) Amended Complaint ("Am. Compl.") [Dkt. 11]; (2) Answer to Amended Complaint ("Answer") [Dkt. 12]; (3) Amended Joint Pretrial Statement ("Am. Jt. Pretrial St.") [Dkt. 44]; (4) Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. Proposed FFCL") [Dkt. 50]; (5) Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. Proposed FFCL") [Dkt.  48]; and (6) the trial transcript ("Tr.") [Dkt. 47].  Citations to Defendants' trial exhibits are herein denoted as "Def. Ex."

**BACKGROUND**

For almost fifty years, Plaintiff has resided at Banneker Place Apartments, located at 410 37th Place, S.E., Washington, D.C.  Mem. Opinion, Sept. 8, 2015 [Dkt. 32].  The apartment building is currently owned and managed by Defendants.  Id.  On September 8, 2011, the apartment rental office learned of a leak in a closet in the unit located directly below Plaintiff's apartment.  Tr. 85.  In response, the building's lead maintenance technician, Keith Turpin, surveyed the leak in the closet and determined that it was coming from the apartment directly above the unit.  Id. at 65.  On or about the next day, Mr. Turpin requested access to Plaintiff's unit, hoping to check its plumbing to find the source of the leak.  Id.  Evelyn Parham, Plaintiff's daughter, allowed Mr. Turpin into Plaintiff's apartment.  Id. at 103.  Once inside, Mr. Turpin determined that the leak was not coming from the unit's bathroom, and asked Evelyn to open the unit's closet for his inspection.  Id. at 102.  Therein, they discovered numerous items that were damp and covered in mildew and mold.  Id. at 109.  The closet's ceiling was also damp and collapsing.  Id. at 11.

Due to the volume of items in the closet, Mr. Turpin could not ascertain where the water was coming from.  Id. at 67; Def. Ex. 3.  Hearing of the issue, Defendants' former residential manager, Gloria White, requested that the Parhams notify Defendants once they removed everything from the closet so that the source of the leak could be identified.  Tr. 31, 67, 71.  A couple days later, the Parhams advised Defendants that they had cleared the closet.  Id. at 92; Def. Ex. 3.  On September 16, 2011, Defendants retained Emerald Plumbing to identify the source of the leak.  Tr. 81.  Emerald Plumbing confirmed that the leak did not originate from a broken pipe in the Plaintiff's unit but from the roof of the apartment building.  Id. at 73, 81.  On September 19, 2011, Defendants retained roofing contractor RW Kibler, Inc., who completed

repairs to the roof on or about September 28, 2011. Id. at 73, 81–83. RW Kibler's September 28, 2011, invoice describes the repairs to the roof as follows: "[We] [l]ocated [a] leak on [the] roof. [Two] vent pipes were loose around membrane. We reflashed the two vent pipes. Downspout at rear of building was clogged with debris; we removed downspout, cleaned, and reinstalled." Def. Ex. 2. On or about September 23, 2011, Defendants retained Riley & Sons Construction Co. to repair Plaintiff's closet with drywall and to paint it with mold-resistant paint. Tr. 74, 84; Def. Ex. 1.

Defendants maintain that the repairs completed by the roofing contractor fixed the problem and stopped water from leaking into Plaintiff's unit. Tr. 83. Plaintiff alleges that, nevertheless, Defendants' failure to promptly remediate the source of her leak on the roof resulted in extensive damage to her belongings that were stored in her closet. Specifically, she identified personal items that she claims were located in the closet that were destroyed by the water entering her unit. The chart below lists these items as well as their purported purchase value and estimated value at the time of their loss, according to Plaintiff:

| Items | When Purchased | Purchase Value | Estimated Value at Time of Loss |
|---|---|---|---|
| A.   Mink Coat | 2006 or 2010[4] | $8,000 (Tr. 15) | $8,000 (Tr. 16) |
| B.   Cape w/ Mink Tassel | 2004 or 2008[5] | $1,800 (Tr. 17) | $1,000 (Tr. 17) |
| C.   Purple Paisley Coat | 2012 | None provided | None provided |
| D.   Five Designer Bags | 1995 | None provided | None provided |
| E.   Two Trench Coats | 1995 | None provided | "$75 or $80" (Tr. 20) |
| F.   Six Silk and Dress Blouses | April 1995 | None provided | None provided |

[4]Initially, Plaintiff testified that the mink coat was purchased six years ago in 2010. She later testified that the mink coat was purchased in 2006. Tr. 18–19.

[5]Initially, Plaintiff testified that the cape with mink tassels was purchased two years earlier in 2008. She later testified that the cape with mink tassels was purchased in 2004. Tr. 18–19.

| | | | |
|---|---|---|---|
| G.  Fourteen Pant Suits | 1995 | $179 per suit (Tr. 21) | $179 per suit (Tr. 21) |
| H.  Three Piece Summer Lace Dress | 1975 | None provided | $1,300 (Tr. 22) |
| I.  Leather trench coat | 1992 | $370 (Tr. 23) | $300 (Tr. 23) |
| J.  Fifteen Dress Suits | | None provided | $2,500 (Tr. 24) |
| K.  Four Wool Sweaters | 1996 | $44.50 – $89 per sweater[6] (Tr. 25) | $50 (Tr. 25) |
| L.  Two Suede Suits | 1994 | None provided | $275 each (Tr. 25) |
| M.  Four Formal Glassware Set | 1980 | None provided | "About $1000 and some" (Tr. 26) |
| N.  Seven Bags/Scarves/Hats | 1994 | None provided | $1,700 (Tr. 26) |
| O.  Six Pairs of Slacks | | $57 per pair (Tr. 27) | $50 per pair (Tr. 27) |
| P.  Snakeskin Boots | 2003 | $2000 (Tr. 27) | $1,800 (Tr. 27) |
| Q.  Box of Ivory China with Gold Trim and Four Plate Setting | 1969 | $800 (Tr. 28) | $800 (Tr. 28) |

Notably, the purchase and estimated values for the above-listed items are based on Plaintiff's recollection alone.  During her testimony, Plaintiff neither referenced nor introduced into the record any receipts, bills of sale, appraisals, or any other evidence as to the value of the items for which she seeks damages.[7]  See Tr. 15–29.  Plaintiff further alleges that, as a general matter, she was harmed because her apartment unit was uninhabitable on account of damp walls, mold, asbestos, and a leak "coming through the ceiling between the walls and the bricks."  Id. at 35–36.  Plaintiff made no attempt to place any value on this harm at trial.  In total, Plaintiff seeks

---

[6] Plaintiff testified that the full price of the four wool sweaters was $89, but she purchased them at "almost half price," i.e., around $44.50.  See Tr. 25.

[7] Plaintiff's counsel moved to admit Plaintiff's supplemental responses to Defendants' interrogatories which may have contained additional valuation information.  Tr. 15.  The motion was ultimately withdrawn because Plaintiff stated that the signature on the document was not hers.  Id.

$14,600 to compensate her for the value of the goods in the closet lost as a result of the leak.[8]  Id. at 47.

The Court held a one-day bench trial on Plaintiff's breach of contract claim on April 28, 2016.  At trial, Plaintiff called one witness, herself, as well as one rebuttal witness, her daughter, Evelyn.  Id. at 8, 101.  In addition to introducing five exhibits, Defendants called three witnesses to testify – Banneker Place lead maintenance technician, Mr. Turpin; the building's former residential manager, Ms. White; and Defendants' property director, Nicolle Davis.  Id. at 63, 69, 89.

At the close of Plaintiff's case-in-chief, Defendants orally moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c).[9]  Id. at 47.  During argument on the motion, Plaintiff's counsel conceded that Plaintiff had not met her burden to prove property damages, but contended that trial should be permitted to proceed because she could be awarded nominal damages.  Id. at 51–53.  Exercising its discretion, the Court declined to enter judgment prior to the close of trial to provide Plaintiff the opportunity to prove at least nominal damages.  Id. at 60; see Fed. R. C. P. 52(c) ("The court may, however, decline to render any judgment until the close of the evidence.").

---

[8]At trial, Plaintiff claimed a total of $14,600 in compensatory damages.  Tr. 47.  Adding up the values of the items destroyed at the time of their loss based on Plaintiff's testimony at trial results in a figure of at least $21,956.  Plaintiff provided no explanation for the discrepancy.

[9] Federal Rule of Civil Procedure 52(c) provides:

> Judgment on the Partial Findings.  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by finding of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

Following the bench trial, the parties submitted proposed findings of fact and conclusions of law.  The Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1) follow.

## FINDINGS OF FACT

1. Since about 1971, Plaintiff has rented an apartment at Banneker Place Apartments, located at 410 37th Place, S.E., Washington, D.C.  Am. Compl. ¶ 1; Answer ¶ 1.  At the time of the September 2011 leak, Plaintiff resided in Apartment Unit 202.  Am. Compl. ¶ 1; Answer ¶ 1.

2. Defendants CIH Properties, Inc., and CIH Ventures, Inc. are Maryland corporations and the registered owners of the property known as Banneker Place, located at 410 37th Place S.E., Washington, D.C.  Am. Pretrial Statement at 2; Notice of Removal [Dkt. 1]; Mem. Opinion, Sept. 8, 2015 [Dkt. 32] at 2.

3. On September 8, 2011, the tenants in the unit directly below Plaintiff's apartment notified Defendants of a leak in the closet of their unit that appeared to be coming from the apartment above.  Tr. 64, 80, 85.

4. On or about September 9, 2011, Defendants' lead maintenance technician, Mr. Turpin, requested access to Plaintiff's apartment to ascertain whether the leak in the unit below originated from Plaintiff's apartment.  Id. at 81, 103.

5. Mr. Turpin was given access to Plaintiff's unit for the purposes of identifying the source of the leak.  Id.

6. Mr. Turpin found evidence of water intrusion and damage inside the closet in Plaintiff's apartment.  Id. at 66, 102–03.

7.  Mr. Turpin could not identify the source of the water in the closet due to the number of items in the closet.  Id.

8.  As a result, the building's residential manager, Ms. White, requested that Plaintiff remove all items from the closet to facilitate Defendants' investigation into the source of the leak. Id. at 67.

9.  Plaintiff cleared the contents of the closet a couple days later to enable inspection of the closet by Defendants.  Id. at 92.

10. Defendants hired Emerald Plumbing on September 16, 2011, to inspect Plaintiff's closet and identify the source of the leak.  Id. at 92; Def. Ex. 3.

11. Emerald Plumbing determined that the leak did not originate from a broken pipe in Plaintiff's closet, but from a source outside her apartment.  Tr. 45; Def. Ex. 2.

12. On or about September 19, 2011, Defendants hired roofing contractor R.W. Kibler.  Tr. 82.

13.  R.W. Killer located a leak on the roof of the apartment building.  Def. Ex. 2.

14. The cause of the leak was a "loose membrane" around two vent pipes on the roof, and a gutter downspout that was clogged with debris.  Id.

15. To fix the leak, R.W. Kibler "reflashed" the membrane around the two vent pipes and removed, cleaned, and reinstalled the downspout.  Id.

16. Banneker Place did not implement any preventative maintenance program to periodically inspect the roof, but instead waited for issues to materialize before remediating the problem.  Tr. 86, 88.

17. On September 22, 2011, Defendants hired Riley & Sons Construction Company to install new drywall and plaster inside Plaintiff's closet, and to repaint it with mold-resistant paint. Id. at 82–83; Def. Ex. 1.

18. The repair to the closet was performed on or about September 23, 2011. Tr. 82–83.

19. As a result of the leak, Plaintiff's personal property located in the closet was destroyed and disposed of. Tr. 103, 108–09.

20. There is no evidence in the record as to the fair market value or the cost to restore two of the seventeen items for which Plaintiff seeks damages – the purple paisley overcoat (item C on the chart above) and the six silk and dress blouses (item F). Id. at 58–59.

21. At trial, Plaintiff conceded that she had not proven actual damages for the following unique items:  a black mink coat (item A), a black cape coat with mink tassels (item B), five designer bags (item D), four formal glassware and sets (item M), one pair of snake skin boots (item P), and one box of Ivory China with gold trim and four place settings (item Q). Id. at 51–54.

## CONCLUSIONS OF LAW

Plaintiff seeks $14,600 for the alleged destruction of her belongings, listed above, due to a leak in her apartment unit. Id. at 47. Alternatively, Plaintiff seeks nominal damages for Defendants' alleged breach of the implied warranty of habitability. Id. at 113. Although Plaintiff's loss of property is regrettable, the Court concludes that Plaintiff has failed to prove actual damages. Plaintiff is, however, entitled to nominal damages stemming from Defendants' liability for breaching the implied warranty of habitability with regard to Plaintiff's apartment. The Court's rationale follows.

i.    Choice of Law

As this case is before this Court on the basis of diversity of citizenship,[10] state law

governs its determination.  See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 80 (1938).  The

parties do not dispute that District of Columbia law applies in this action.  Tr. 60.  Upon applying

the choice-of-law principles of the forum jurisdiction – i.e., the District of Columbia – the Court

arrives at the same conclusion.  See Liberty Mutual Ins. Co. v. Travelers Indemnity Co., 78 F.3d

639, 643 (D.C. Cir. 1996).

When facing a choice of law question, District of Columbia courts employ the modified

governmental interest analysis, which seeks to apply the law of the jurisdiction with the most

significant relationship to the dispute.  In re APA Assessment Fee Litigation, 766 F.3d 39, 51

(D.C. Cir. 2014).  Everything of significance in this matter, other than Defendants' corporate

location, was located in this District, including Plaintiff's apartment, her personal property

located in its closet, and the leak which damaged it.  Moreover, the District of Columbia has a

strong interest in the resolution of this conflict, which implicates the rights of tenants domiciled

in, and landlords conducting business within, the District.  Accordingly, District of Columbia

law applies to the instant action.

ii.    Defendants Breached the Implied Warranty of Habitability

The D.C. Circuit has long held that "leases of urban dwelling units should be interpreted

and construed like any other contract."  Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1075

(D.C. Cir. 1970).  In the event of a breach of the terms of the lease, all contract remedies are

---

[10] At the commencement of this action, the amount in controversy exceeded the $75,000 limit necessary for diversity jurisdiction.  See 28 U.S.C. § 1332; Am. Compl. ¶ 21.  However, Plaintiff's damages claim decreased significantly when her tort claims were dismissed.  Tr. 47; see supra n.1.  Nevertheless, a subsequent decrease in the amount in controversy does not divest this Court of jurisdiction if the decrease occurs after the suit is filed.  See Walker v. Waller, 267 F. Supp. 2d 31, 33 (D.D.C. 2003).  Rather, diversity jurisdiction is fixed at the time suit is filed.  Id.

available, including compensatory damages.  Id. at 1082 n.61.  Under District of Columbia law,

to prevail on a breach of contract claim, the injured party must establish that there was a valid

contract between the parties, an obligation or duty arising out of the contract, a breach of that

duty, and actual damages flowing from the breach.  Francis v. Rehman, 110 A.3d 615, 620 (D.C.

2015).

This same formula applies under D.C. law when a tenant invokes the implied warranty of

habitability as an affirmative action for damages against a landlord.  Javins, 428 F.2d at 108.

The warranty of habitability, activated upon the landlord signing the lease, is non-waivable and

read into all leases for residential housing in the District of Columbia.  Id. at 1081; Beltway

Mngmt. Co. v. Lexington-Landmark Ins. Co., 746 F. Supp. 1145, 1149 (D.D.C. 1990).  It creates

for landlords a continuing duty during the lease term to "exercise reasonable care to maintain

rental premises in compliance with the [D.C.] housing code."  George Washington Univ. v.

Weintraub, 458 A.2d 43, 47 (D.C. 1983).  A landlord's failure to comply with the housing

regulations constitutes a privately-enforceable breach of the warranty of habitability.  Javins, 428

F.2d at 1082.

The D.C. Housing Regulations are set forth in Title 14 of the District of Columbia

Municipal Regulations.  D.C. Mun. Reg. Tit. 14.  They are designed to promote "the public

health, safety, welfare, and morals through the abatement of certain conditions affecting

residential buildings and areas, including dilapidation."  Id., § 100.2.  The Regulations generally

require, inter alia, that every rental premises

> be maintained and kept in repair so as to provide decent living
> accommodations for the occupants.  This part of the code contemplates
> more than mere basic repairs and maintenance to keep out the
> elements; its purpose is to include repairs and maintenance designed to
> make a premises or neighborhood healthy and safe.

Id., § 700. Relevant to this action in particular, the Regulations require District landlords to connect and maintain in good condition all gutters and downspouts, ensure that water will be conveyed off premises in accordance with the D.C. Plumbing Regulations, and ensure that any drainage flows away from the inhabited building. Id., §§ 703.1, 703.2, 703.4.[11]

In the instant action, Plaintiff and Defendants entered into a contractual relationship upon signing a lease. Tr. 56. Thereupon, Defendants undertook a continuing duty to maintain the premises in compliance with the D.C. Housing Regulations, which, the Court finds, it failed to do in this instance. Plaintiff has sufficiently established that the intrusion of water into her apartment unit was not caused by her negligence or the fault of a third party under her control. Id. at 45–46; Def. Ex. 5; see also Weintraub, 458 A.2d at 45 (finding that the water intrusion in the tenant's apartment, through no fault of the tenant or a third party, constituted a breach of the warranty of habitability). Rather, the source of the leak was the gathering of water on the roof of the building as a result of a gutter downspout clogged with debris. Def. Ex. 2.[12] The gathered water then leaked into the apartment building – and Plaintiff's unit within the building – through

---

[11] Specifically, the Regulations require in relevant part:

> 703.1 All gutters and downspouts shall be properly connected, and shall be maintained in good condition, free of holes and obstructions.
>
> 703.2 Water shall be conveyed off premises in accordance with the plumbing regulations of the District of Columbia.
>
> 703.4 If there are no sewer traps, the drainage shall flow away from any inhabited building on the premises.

D.C. Mun. Regs. Tit. 14, §§ 703.1, 703.2, 703.4.

[12] At trial, Ms. White testified that the leak originated from a downspout that had detached from the scupper on the roof, thereby causing water to pool on the roof and to enter Plaintiff's apartment. Tr. 85–86. The Court finds that the roofing contractor's contemporaneous invoice of the repair of the leak to be a more reliable source as to its cause than Ms. White's recollection over four years after the fact. But even were the Court to accept Ms. White's testimony as to the leak's cause, the Court's conclusion that Defendants are liable for the damages caused by the leak would not change. In the exercise of reasonable care, Defendants could have discovered the downspout detached from the scupper on the roof through a preventative roof maintenance program.

a loose membrane around two vent pipes on the roof.  Id.  Based on these facts, the Court finds

that Defendants violated one or more sections of the D.C. Housing Regulations – namely

sections 703.1, 703.2, and 703.4 – when it failed to keep the downspout on the roof of the

apartment building unobstructed, which allowed water to pool on the roof rather than flow away

from the building.

Nevertheless, under District of Columbia law, a tenant can recover damages for a

landlord's breach of the warranty of habitability only if the landlord did not cure the violation of

the housing code at issue within a reasonable amount of time after the landlord received actual or

constructive notice of the defective condition.  Weintraub, 458 A.2d at 48.  But "notice need not

be given by the tenant if the landlord, in the exercise of reasonable care, could have become

aware of the defective condition."  Id.  In such an instance, the landlord is deemed to have had

constructive notice of the defective condition.  Id.

Importantly, it is the landlord's burden to prove lack of notice, both actual and

constructive, of the defective condition that constitutes the breach.  Id.  Here, Defendants have

not met that burden.  The Court finds that Defendants had constructive notice of the cause of the

water intrusion into Plaintiff's apartment.  In the exercise of reasonable care, Defendants could

have become aware of the clogged downspout and gathering water that caused the leak,

specifically through a regular preventative maintenance program of the building's roof and

gutters.  Homeowners know they need to keep their gutters clear of obstructions or risk a leak

through their roof; Defendants should have known that as well and should have had a

maintenance program to prevent it.

Indeed, the fact that the cause of the water intrusion here was within the "exclusive

control of the landlord," and not within the confines of the tenant's apartment unit, makes the

liability of Defendants all the more apparent.  See Keller-Loup Const. Co. v. Gerstner, 476 P.2d

272, 274 (Colo. App. 1970) (finding the landlord liable for water damage to tenant's property

because "the pipe which burst was in the exclusive control of the landlord and he was under a

duty to keep the pipe in a condition of reasonable safety insofar as it affected the tenant"); cf.

Dwyer v. Skyline Apartments, Inc., 301 A.2d 463, 464 (N.J. Super. Ct. App. Div. 1973) (where

the defect – a corroded faucet in tenant plaintiff's bathtub – was latent "and not discernible on

reasonable inspection," landlord was not found liable); see also Restatement (Second) of

Property § 5.5(2) ("[T]he landlord is obligated to the tenant to keep safe and in repair the areas

remaining under his [or her] control that are maintained for the use and benefit of his [or her]

tenants.").

Moreover, Defendants had prior notice of problems with the apartment building's

downspouts.  Unlike the leak in Weintraub, problems with the building's downspouts were not a

"one time thing," but rather, a recurrent condition.  Cf. Weintraub, 458 A.2d at 49 (not holding

landlord liable for damages flowing from its breach of the implied warranty in part because the

leak from the pipes had never occurred before).  At trial, Ms. White testified that, due to

inclement weather, downspouts had detached from the scupper and roof "a few times" before the

leak into Plaintiff's apartment.  Tr. 88.  Defendants were, thus, on notice of a reoccurring issue

with the downspouts on the building's roof that had caused, or could cause, water intrusion into

the building.  See Miller v. Christian, 958 F.2d 1234, 1240–41 (3d. Cir. 1992) (finding landlord

liable for breach of the implied warranty of habitability where he had constructive knowledge of

a recurring issue with the sewage).  Nevertheless, Defendants did not implement a maintenance

program to periodically inspect the gutters and the roof.  Tr. 86 (Ms. White testifying that "[w]e

do not have a preventative maintenance program in effect.").  Instead, Defendants' policy was to

take action once it was too late – that is, once a water intrusion caused by defective downspouts on the building's roof had been identified. Id. at 88.  As the building's former residential manager testified, Defendants only discovered problems with the building's downspouts "when the water comes in." Id.  That was not sufficient under the D.C. Housing Regulations, and it is not sufficient for Defendants to avoid liability now.

Because Defendants had constructive notice of the cause of the leak at issue, their retention of contractors to repair it once the leak occurred does not relieve them of liability for damage to Plaintiff's property cause by the water intrusion.  See Miller, 958 F.2d at 1241.  Periodic inspections of the roof and downspouts could have avoided that damage in the first place.  The Court, thus, finds Defendants in breach of the implied warranty of habitability.

iii.      Plaintiff Cannot Prove Actual Damages

In the event of a landlord's breach of the implied warranty of habitability, all contract remedies, including compensatory damages, are available to a tenant. Javins, 428 F.2d at 1082 n.61; Weintraub, 458 A.2d at 47 (D.C. 1983) (holding that a plaintiff may invoke the "warranty of habitability as the basis for an affirmative action for damages in this jurisdiction.").  To prove damage to property as a result of the breach, the plaintiff must first identify whether the damaged property is either repairable or completely destroyed. Wentworth v. Air Line Pilots Ass'n, 336 A.2d 542, 543–44 (D.C. 1975).  If the plaintiff's property is repairable, the measure of damages is the reasonable cost to restore the item to its condition prior to the damage. Withers v. Wilson, 989 A. 2d 1117, 1119–20 (D.C. 2010).  If, however, the property is completely destroyed, the plaintiff is entitled to the fair market value of the item at the time of its destruction. American Serv. Ctr. v. Helton, 867 A.2d 235, 243 (D.C. 2005).  The fair market value is the price that would result from "fair negotiations between an owner willing to sell and a purchaser desiring to

14

buy" the destroyed property at the time of its loss.  <u>Royer v. Diehl</u>, 55 A.2d 722, 724 (D.C.

1947).  Stated another way, the fair market value should reflect not only the item's purchase

price, but also its age, depreciation, and the effect of ordinary wear and tear prior to its loss.

<u>Withers</u>, 989 A.2d at 1120–21.

How the plaintiff proves the value of a destroyed item depends on the nature of the item

itself.  For ordinary items, District of Columbia law does not require the plaintiff to prove the

measure of damages with meticulous precision as long as the plaintiff proves the fact of damage

and provides a "reasonable basis for approximation" of the items' value.  <u>Romer</u>, 449 A.2d 1097;

<u>see also</u> <u>W.G. Cornell Co. of Washington, D.C. v. Ceramic Coating Co., Inc.</u>, 626 F.2d 990, 993

(D.C. Cir. 1980).  An owner's personal estimate of the value of the goods can be admitted as

evidence of the basis for the value of the items even absent any independent corroborative

evidence of that value.  <u>Maalouf v. Butt</u>, 817 A.2d 189, 191 (D.C. 2003); <u>see also</u> <u>Manning v.

Lamb</u>, 89 A.2d 882, 884 (D.C. 1952) ("The prevailing rule is that the owner of an article . . . may

testify as to his estimate of the value of his own property.").  This is so because "[o]wnership,

coupled with familiarity with the quality and condition of the article" constitutes "sufficient

qualification for [the owner's] testimony."  <u>Glennon v. Travelers Indemnity Co.</u>, 91 A.2d 210,

211 (D.C.  1952).  An owner's "[l]ack of general knowledge" and the facts on which she bases

her estimation "go[] to the weight" and credibility of the testimony and "not to its competency."

<u>Id.</u>

However, for unique, designer items such as a mink coat, the owner's testimony alone

will not suffice to prove the fair market value of the destroyed item.  <u>Mahallati v. Williams</u>, 479

A.2d 300, 306 (1984).  Rather, the plaintiff must provide expert testimony to prove the value of

such a unique item at the time it was lost.  <u>Id.</u>

Guided by these principles, the Court finds that Plaintiff failed to prove actual damages arising from Defendants' breach.  Indeed, Plaintiff's counsel conceded this failure at the close of Plaintiff's case.  See Tr. 113 (Plaintiff's counsel:  "In fact, I don't think we really proved damages."); see also Pl. Proposed FFCL ¶ 3 ("The plaintiff testified that the water flowing from the downspouts into her closet cause [sic] damages to and loss of personal property however she was unable to adequately establish an accurate value.").  Counsel's concession was well-taken. The only evidence Plaintiff presented as to the value of the goods damaged in her closet was her own testimony.  She did not provide, for example, receipts, appraisals, or surveys of prices of goods of similar type, age, and quality.  For the unique items for which she was claiming damages, Plaintiff's proof at trial was insufficient.  Mahallati, 479 A.2d at 306.  Such items require special expertise to estimate the fair market value prior to destruction.  Id.  Accordingly, Plaintiff failed to prove the fair market value of the following items which the Court finds to be unique:  the mink coat, cape with mink tassels, five designer bags, four formal glassware set, snakeskin boots, and box of ivory china with gold trim and a four plate setting, i.e., items A, B, D, M, P, and Q on the chart above.  Tr. 51–54.

While the Mahallati rule does not apply to the eleven other ordinary items for which Plaintiff seeks damages, see Maalouf, 817 A.2d at 191, the Court does not assign significant weight to the estimated values Plaintiff put on these items during her testimony at trial.  While the Court found that Plaintiff was competent to testify as to her personal estimates, her testimony was not persuasive as to the value of the lost goods.  Plaintiff presented as an easily confused witness who frequently had to be led by counsel.  She inconsistently provided estimated purchase prices, years of purchase, and valuations for some, but not all, of the lost items.  For example, she never provided the fair market value for the purple paisley coat, the five designer

bags, or the six silk and dress blouses. Tr. 58–59. These omissions appeared to the undersigned not to be purposeful, but rather examples of the chaotic tangle that was Plaintiff's testimony. What is more, Plaintiff testified that the purple paisley coat was purchased in 2012, a year after the 2011 leak that allegedly destroyed Plaintiff's property. Id. at 18. As for other items, Plaintiff appeared to be conjuring values out of thin air for items that were purchased more than twenty years ago. For example, Plaintiff testified that the value of two suede suits was "like 200 and something. I would say – I would say $275 each." Id. at 25.

Further, Plaintiff provided no testimony as to the basis of her estimated values. With the exception of her estimation for the ivory china set (item Q),[13] Plaintiff did not explain whether her estimations of the value of the lost items were based on surveys of prices of goods of comparable type, age, and quality, or other reliable information. See Hartford Acc. & Indem. Co. v. Dikomey Mfg. Jewelers, Inc., 409 A.2d 1076, 1080 (D.C. 1979) ("As a general rule, the facts upon which an owner bases his opinion go to the weight of the testimony . . . . The owner necessarily relies on inquiries, comparisons, purchases, and sales in forming notions of value."); see also Glennon, 91 A.2d at 211 (finding that the owner's testimony was admissible but noting that "she was subject to cross examination to bring out the basis, or lack of basis, for her estimate" to determine the weight afforded her testimony). Without more, the Court is at a loss as to how Plaintiff arrived at her estimates. It appeared to the undersigned that they were no more than guesses without any foundation.

Moreover, Plaintiff provided no fair assessment of the depreciation of the value of the damaged goods. Given the age of many of these items, this raises a significant question as to

---

[13] Plaintiff testified that she "called and checked" to determine the purchase value of the ivory china set. Tr. 27. She did not, however, testify as to who she called to ascertain this value – e.g., an appraiser, the company or retailer that sells the china set, etc.

their fair market value when they were damaged in 2011.  For example, Plaintiff claimed

improbably that the fair market value in 2011 of each of the fourteen pant suits was equivalent to

their purchase price in 1994.  Tr. 21; see Mahallati, 479 A.2d at 306 ("Although [plaintiff]

testified that the coat was in good condition [prior to the alleged conversion], we simply cannot

accept [plaintiff's] contention that it is worth as much now, ten years later, as when new.").  Nor

was there any reliable testimony concerning the condition of any of the items at the time of their

loss.  Much like Plaintiff's testimony concerning the purchase prices for the lost goods, her

testimony concerning their value at the time of loss appeared to have been created on the spot.

> For these reasons, the Court has no confidence in the values Plaintiff presented at trial for

the goods lost as a result of the leak.  Granted, an injured party is not precluded from recovering

damages because she cannot establish with exactitude actual damages of ordinary property.  But

a plaintiff still must provide some reasonable basis on which a trier of fact can provide an

approximation of the value of the goods lost.  Maalouf, 817 A.2d at 191.  Here, Plaintiff failed to

do so for any of the items she claims were destroyed by the leak.  Accordingly, the Court will not

award her any actual damages stemming from Defendants' breach of the implied warranty of

habitability.

### iv.    Plaintiff is Entitled to Nominal Damages

> Nevertheless, Plaintiff contends that she is entitled to nominal damages for Defendants'

breach.  Tr. 113.  The Court agrees.  Under District of Columbia law, should a tenant fail to

prove actual damages, she may receive nominal damages.  Roth, 126 A.2d 153; Wright v.

Howard Univ., 60 A.3d 749, 753 (D.C. 2013).  The term nominal damages means "a trivial sum

– usually one cent or one dollar – awarded to a plaintiff whose legal right has been technically

violated but who has proved no real damage."  Chesapeake & Potomac Tel. Co. v. Clay, 194

F.2d 888, 889 (D.C. Cir. 1952); see also Patel v. Howard Univ., 895 F. Supp. 199, 204–05

(D.D.C. 1995) (identifying $1.00 as the "appropriate amount for nominal damages" in the

District of Columbia) (citing Wisconsin Ave. Assocs. Inc. v. 2720 Wisconsin Ave. Coop.

Assn'n, Inc., 441 A.2d 956, 961 (D.C. 1982)).  In such a case, "the injury . . . is breach itself, and

nominal damages suffice to state a claim under D.C. contract law, . . . which applies to federal

district courts sitting in diversity."  Alston v. Flagstar Bank, FSB, 609 Fed. Appx. 2, 3 (D.C. Cir.

2015) (citing Novak v. Capital Mgmt. & Dev. Corp., 452 F.3d 902, 907 (D.C. Cir. 2006)).

Accordingly, because Plaintiff proved at trial that Defendants breached the implied warrant of

habitability but failed to prove any actual damages arising therefrom, the Court will award

Plaintiff nominal damages in the amount of $1.00.

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in Plaintiff's favor and award

her nominal damages in the amount of $1.00.  A final judgment accompanies the Court's

Findings of Fact and Conclusions of Law.


Date:  September 13, 2016          _____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE